```
IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
```

```
QUORUM HEALTH RESOURCES, LLC,    )
                                 )
              Plaintiff,         )
                                 )
         v.                      )    1:06CV954
                                 )
HUGH CHATHAM MEMORIAL HOSPITAL,  )
INC.,                            )
                                 )
              Defendant.         )
```

## MEMORANDUM OPINION AND ORDER

**Eliason, Magistrate Judge**

This case is before the Court on cross-motions for summary judgment. Although the parties disagree as to what the outcome of the case should be, both agree on the basic facts of the case and that this case is one that is well-suited for being decided on summary judgment.

### I. FACTS

The facts, as follows, are undisputed as reflected by the briefs and evidence of the parties. In 1985, Defendant, a hospital located in Elkin, North Carolina, entered into a contract with a predecessor of Plaintiff.[1] (Docket No. 18, Ex. A.) The contract, entitled "MANAGEMENT AGREEMENT," required Plaintiff to provide hospital management services to Defendant. (Id. Ex. B.) The Agreement continued through a series of renewals until Defendant

---

[1] For the purposes of this case, there is no difference between Plaintiff and its predecessors. Therefore, they will collectively be referred to as "Plaintiff."

decided not to renew it in 2006. (Docket No. 14, Tab D, Req. For Admiss. 2.)

There is only one provision of the Agreement, Section 2.42, that is important to this case.[2] That provision requires Plaintiff to provide "a Hospital Administrator whose qualifications, salary and benefit cost shall be acceptable to [Defendant] on a continuing basis." (Docket No. 18, Ex. B. at 6.) The Hospital Administrator continued to be an employee of Plaintiff. (<u>Id.</u>) However, Defendant promised to "reimburse [Plaintiff] for salary and fringe benefits paid to or on behalf of the Hospital Administrator." (<u>Id.</u>) It was mandated that the term "fringe benefits":

> shall include the employer's contribution of F.I.C.A., payroll taxes, unemployment compensation, other employment taxes, employment fees, pension plan contributions, bonus, car allowance, recruiting and relocation costs, administrator travel, workmen's compensation, group life and accident and health

---

[2]Section 2-42 of the Management Agreement reads as follows:

2.42 <u>Special Employees</u>. HMP shall provide the Hospital with a Hospital Administrator whose qualifications, salary and benefit cost shall be acceptable to HCMH on a continuing basis. The Hospital Administrator shall be an employee of, and compensated by HMP, and may be removed at any time from the Hospital at the reasonable discretion of HMP. HCMH shall reimburse HMP for salary and fringe benefits paid to or on behalf of the Hospital Administrator. With the approval of HCMH, HMP may place other employees of the Hospital including without limitation, the Controller and Director of Nursing, on HMP's payroll, in which event HCMH shall reimburse HMP for such employees. Fringe benefits shall include the employer's contribution of F.I.C.A., payroll taxes, unemployment compensation, other employment taxes, employment fees, pension plan contributions, bonus, car allowance, recruiting and relocation costs, administrator travel, workmen's compensation, group life and accident and health insurance premiums, disability and other benefits, but shall not include stock options.

(Docket No. 18, Ex. B at 6.)

insurance premiums, disability and other benefits, but
shall not include stock options.

(Id.)

At the time the Agreement was terminated, Richard Osmus was the Hospital Administrator assigned under the Agreement. He had 15 years of service and a base salary of just over $190,000.[3] (Docket No. 18, Ex. H.) The Agreement terminated in June of 2006, and, shortly thereafter, Plaintiff terminated Osmus' employment. As already stated, Osmus was an employee of Plaintiff. While Plaintiff could have continued his employment at another hospital or in another capacity, it did not. (Docket No. 14, Tab D., Req. For Admiss. 11, 22.)

Unbeknownst to Defendant, Plaintiff had in place a "Severance Policy" which covered its own employees, including Osmus. Osmus was eligible under that policy for an amount equal to one year of base salary. However, only one month's worth, over $14,000,[4] of that payment was automatic. The rest, over 175,000,[5] was conditioned upon Osmus signing a release which waived any legal claims Osmus might have had stemming from his employment or termination. (Docket No. 18, Exs. H, J.)

Defendant first became aware of the severance policy on June 19, 2006 when Plaintiff informed it by letter of the policy and of the amount that would be due to Osmus. (Docket No. 14, Tab C., Ex.

---

[3]The exact amount was $190,004.

[4]The exact amount was $14,615.69.

[5]Actually, $175,388.31.

-3-

1.) The letter covered several other types of payments and scenarios, but the relevant portion indicated that Defendant would owe Plaintiff for Osmus' severance payment under the Management Agreement. An attached worksheet calculated the payment to be equal to Osmus' yearly salary of just over $190,000. (Id.)

Upon receipt of the letter, Defendant's Board of Trustees met and considered the matter. On June 27, 2006, the Board concluded that it did not have any responsibility under the Management Agreement to reimburse the severance/release[6] payments. However, in what were described as "gestures of goodwill" to Osmus, it did agree to reimburse Plaintiff for the initial $14,000 severance payment to Osmus and, if necessary, to provide an additional $15,000 for outplacement services to help Osmus locate new employment. It declined to pay Plaintiff the additional $175,000 that was conditioned on the signing of the release. (Docket No. 18, Ex. K.)

Following the end of the Management Agreement, Plaintiff terminated Osmus, Osmus signed the release,[7] and Plaintiff paid him $190,000 in severance/release benefits. (Id. Ex. M; Docket No. 19, Ex. 1.) Defendant did reimburse Plaintiff $14,000 of that amount.

---

[6]The parties disagree as to whether the payment conditioned on the signing of the release should be characterized as a severance payment or a release payment. Rather than resolve this dispute, the Court will simply use the term "severance/release payment" given that both his severance and his release were conditions precedent to his entitlement to the payment.

[7]The release also waived any claims against Defendant (Docket No. 19, Ex. 1), but this was not at Defendant's request. Defendant informed Plaintiff that it had no reason to request such a release and that it would not pay additional severance benefits to get one. (Docket No. 14, Tab C., Ex. 2.)

-4-

Plaintiff then filed suit seeking to recover the remaining $175,000. Both parties have moved for summary judgement on these claims.

## II. DISCUSSION

Plaintiff brings claims for breach of contract based on the Management Agreement and for a declaratory judgment stating that the term "other benefits" in Section 2.42 of the Management Agreement includes the severance/release payments made to Osmus. Naturally, those claims rise or fall together.

The parties appear to agree that North Carolina law controls the interpretation of the Management Agreement. The Court will therefore apply state law where it is clear. When state law is unclear, the Court must rule in such a manner as it appears the North Carolina Supreme Court would rule if presented with the issue. If the North Carolina Supreme Court has not decided a particular issue, the Court will examine the rulings of the lower state courts. Rulings of the lower courts may be considered as persuasive evidence of state law, but they are not binding on the Court should it be convinced the higher court would rule to the contrary. Sanderson v. Rice, 777 F.2d 902, 903 (4th Cir. 1985). Furthermore, the Court must rule on state law as it exists, as opposed to surmising or suggesting an expansion of state law. Burris Chemical, Inc. v. USX Corp., 10 F.3d 243 (4th Cir. 1993).

A party needs to prove only two elements to establish a breach of contract claim in North Carolina. First, it must show that a valid contract existed. Second, it must demonstrate that the

-5-

opposing party breached one or more of the terms of the contract. Johnson v. Colonial Life & Acc. Ins. Co., 173 N.C. App. 365, 369, 618 S.E.2d 867, 870 (2005). The parties did have a valid contract in the form of the Management Agreement. Therefore, only the second element of Plaintiff's claim is at issue.

Plaintiff contends that Defendant, by refusing to cover the full cost of the severance/release payments to Osmus, breached the portion of Section 2.42 of the Management Agreement that required Defendant to reimburse Plaintiff for fringe benefits paid to Osmus. This argument assumes that the severance/release payment was a "fringe benefit" under the Management Agreement. Although the Agreement defines that term and lists many specific examples of covered benefits, it does not explicitly list severance or release payments. Plaintiff points to the catchall phrase "other benefits," which is present at the end of the list of specific types of fringe benefits. It claims that the term "other benefits" includes the severance/release payment which, therefore, constitutes a reimbursable "fringe benefit" under the Management Agreement. Naturally, Defendant disagrees.

Because the parties disagree over the proper interpretation of a term in their contract, the Court must look at whether that language can be interpreted to support one of their proffered meanings as a matter of law. An important step in contract interpretation is determining whether a disputed term is ambiguous or unambiguous. As the North Carolina Court of Appeals has explained:

> "A contract which is plain and unambiguous on its face
> will be interpreted as a matter of law by the court."
> Dept. of Transportation, 114 N.C. App. at 100, 440 S.E.2d
> at 864. If the agreement is ambiguous, however,
> interpretation of the contract is a matter for the jury.
> Id. Ambiguity exists where the contract's language is
> reasonably susceptible to either of the interpretations
> asserted by the parties. Glover v. First Union National
> Bank, 109 N.C. App. 451, 456, 428 S.E.2d 206, 209 (1993).
> "The fact that a dispute has arisen as to the parties'
> interpretation of the contract is some indication that
> the language of the contract is, at best, ambiguous." St.
> Paul Fire & Marine Ins. Co. v. Freeman-White Assoc.,
> Inc., 322 N.C. 77, 83, 366 S.E.2d 480, 484 (1988).

Dockery v. Quality Plastic Custom Molding, Inc., 144 N.C. App. 419, 421-22, 547 S.E.2d 850, 852 (2001). Here, both parties argue that the contract is unambiguous, but have offered two separate meanings for the language in it.

Defendant contends that the contract is unambiguous because it sets out sixteen specific items as "fringe benefits," and neither severance nor release payments are specifically listed. To include them, it asserts, would amount to adding language to the contract. (Docket No. 15 at 7-8.) This argument ignores the fact that the list also includes the term "other benefits," and essentially erases it from the contract. This approach runs afoul of the often repeated admonition that every term in a contract has meaning and should be given effect, if possible. See, e.g., Brown v. Lumbermens Mut. Cas. Co., 326 N.C. 387, 393, 390 S.E.2d 150, 153 (1990).

Defendant's other argument acknowledges both that the term "other benefits" is in the contract and that it has some meaning, but that the term is ambiguous. It seeks to get around this complication by arguing that interpretation of an ambiguous term in

-7-

a contract can sometimes be performed by the court where ambiguous language can only be given one meaning after all extrinsic evidence is examined. <u>Teamsters Local 391 v. Ball Corp.</u>, 355 F. Supp. 2d 803, 809 (M.D.N.C. 2005). Defendant contends that this is just such a case and that the use of interpretation principles and extrinsic evidence renders the term "other benefits" unambiguous, at least to the extent that it can be said as a matter of law that severance and release payments are not covered.

Unfortunately for Defendant, the truth is that there is little or no extrinsic evidence in the case. Neither party has actually introduced extrinsic evidence showing the intent of the parties at the time the agreement was formed, the context of the agreement, common usage of the term "other benefits" in the industry, or any course of dealing between the parties giving light to the meaning of "other benefits." Defendant does point out that ambiguous clauses in contracts are generally construed against the drafter. <u>See</u> <u>Novacare Orthotics & Prosthetics East, Inc. v. Speelman</u>, 137 N.C. App. 471, 476, 528 S.E.2d 918, 921 (2000). However, this does not mean that the clause must be construed to mean what Defendant now contends.[8] For this reason, the Court rejects Defendant's approach.

For its part, Plaintiff argues that the term "other benefits" is unambiguous and proposes a meaning. Plaintiff describes the term as a catchall phrase included in the contract because the

---

[8]Defendant does not proffer an alternate meaning of "other benefits," much less one that could be construed as excluding severance and release payments.

parties could not possibly produce a completely exhaustive list of benefits that might be offered to an employee. Therefore, it claims that the term "other benefits" was added to allow for a wide range of similar, potential fringe benefits. (Docket No. 17 at 6.) As an example, Plaintiff contends that severance and release payments are like unemployment compensation, which is a listed benefit. See Whitaker v. Old Dominion Guano Co., 123 N.C. 368, 31 S.E. 629 (1898)(ejusdem generis). Plaintiff also points out that, had the parties sought to limit the potential list of benefits by excluding the severance/release payments, they knew how to do so as evidenced by the fact that stock options were specifically eliminated from the list of fringe benefits. (Id.)

There are a number of problems with Plaintiff's suggested construction. First, the term "fringe benefits" includes items which obviously are not "benefits" at all, such as taxes and unemployment compensation, their being something imposed or granted by a government. Thus, while it is possible that "other benefits" refers to severance payments, that interpretation is not mandated. Second, assuming that severance pay may be akin to pension contributions or insurance premiums, it is not clear that "payments for signing a release would be thought to fit in the same category.[9]

---

[9]Defendant cites Parker v. Underwriters Laboratories, Inc., 140 Idaho 517, 96 P.3d 618, 622-623 (2004), and DiCerbo v. Commissioner of Dept. of Employment and Training, 54 Mass. App. Ct. 128, 763 N.E.2d 566 (2002), and argues the courts found a payment for a release was not based on service and, therefore, not a severance benefit. Plaintiff disputes that those cases govern the facts in this case. The Court need not resolve the disagreement to render a decision in this
(continued...)

The Court does agree with Plaintiff that including the indefinite term "other benefits" in the list of seventeen specific items was likely done for the purpose of inserting some flexibility so that other types of benefits not anticipated by the parties at the time of the agreement could be given to the employees covered by Section 2.42. But, as will be seen, the answer to the question of what benefits fall within the term "other benefits" cannot be found solely by looking to the sentence in Section 2.42 defining fringe benefits. Rather, other parts of the contract must be consulted.

To find the answer, we first start with the basic contract construction principle, which holds that "'[s]ince the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole.'" Atlantic & N.C.R. Co. v. Atlantic & N.C. Co., 147 N.C. 368, 61 S.E. 185 (1908)(quoting Paige on Contracts, § 1112). Whether the severance/release payments were intended to fall within the ambiguous term "other benefits" cannot be determined by focusing on the fringe benefit sentence. Instead, the answer is found by including the very first sentence of Section 2.42 in the analysis.

The first sentence in Section 2.42 requires Plaintiff to provide Defendant "with a Hospital Administrator whose

---

[9](...continued)
case.

qualifications, <u>salary</u> <u>and</u> <u>benefit</u> <u>cost</u> <u>shall</u> <u>be</u> <u>acceptable</u> <u>to</u> <u>[Defendant]</u> <u>on</u> <u>a</u> <u>continuing</u> <u>basis</u>." (emphasis added.)  Unlike the term "other benefits," this language is specific, clear, and susceptible to only one meaning.  While the Hospital Administrator was to remain an employee of Plaintiff, Defendant retained the final say as to qualifications and, more importantly for our purpose, the overall compensation costs.  It essentially reserved for itself veto power over any benefits, whether specifically listed or falling within the undefined territory of "other benefits."  In other words, the meaning of the term "other benefits" is a benefit acceptable to the Hospital.  Here, Defendant's Board of Directors essentially found the cost of one month of severance pay for Osmus to be acceptable[10] and eleven more months of pay conditioned on a release to be unacceptable.

Plaintiff attempts to avoid this outcome by making the following argument:  (1) the Management Agreement says benefit costs must be acceptable to Defendant; (2) the Agreement defines benefits to include the sixteen specific items and "other benefits"; (3) the severance/release payments were "other benefits"; (4) therefore, the cost of the severance/release payments were automatically "acceptable" to Defendant.  In other words, according to Plaintiff, when Defendant signed the contract, it accepted the obligation to reimburse Plaintiff for any benefit

---

[10]Defendant's Board did not agree that it was paying even the single month's worth of pay as satisfaction of any obligation under the Management Agreement.  Nevertheless, it made the payment and thereby indicated that this level of payment was acceptable to it whether or not it felt obligated to make the payment under the contract.

-11-

Plaintiff saw fit to give to the administrator and any level of benefit and amount of salary.

For three reasons, one legal, one linguistic, and the other practical, the Court rejects Plaintiff's interpretation of the contract. First, Plaintiff's proposed reading of the contract fails because it reduces the acceptability clause in Section 2.42 to mere surplusage. There would be no reason to have language stating that the benefit cost must be acceptable to Defendant on a continuing basis if Defendant is then automatically deemed to have accepted the cost of the listed fringe benefits, particularly since (according to Plaintiff) those benefits appear to compose the entire universe of possible benefits. It would have been simpler for the contract to have read, "Defendant agrees to reimburse Plaintiff in any amount for the listed fringe benefits and any other benefit Plaintiff wishes to give." However, the parties did not choose this language, but instead included a separate acceptability clause which must have meaning under the legal rules of contract construction.

The linguistic difficulty with Plaintiff's interpretation is that it ignores the word "cost" by equating benefit cost and benefit type. The first sentence of Section 2.42 gives Defendant some control over the **cost** of the Hospital Administrator, including the cost of his benefits. The later sentences only describe **types** of benefits that may be given to the Administrator by Plaintiff, not costs. While the Agreement arguably leaves Plaintiff with some

discretion to add a new type of benefit, it clearly leaves final control over the costs in Defendant's hands.

Finally, Plaintiff's reading of the contract would create the potential for a serious practical problem.  If, as Plaintiff suggests, the contract should be read so as to deem Defendant to have already accepted the costs of all of the specifically listed benefits and anything covered by "other benefits," this would mean that Plaintiff would retain absolute control over benefits, without the cost constraints felt by ordinary employers.  There would be nothing to have stopped Plaintiff in the present situation from promising Osmus a million dollar severance/release payment or other hidden benefits and then forcing reimbursement from Defendant under the Management Agreement.  Unless something in the contract clearly and explicitly mandates otherwise, a contract should be read in a way which balances the duties and obligations between the parties because that is the usual purpose for contracting.  The Court should avoid a skewed and grossly inequitable reading of the contract.

When Section 2.42 is viewed as a whole, when all of its language is given meaning, and when the structure of the Management Agreement is considered, it is clear and unambiguous.  It created a relationship between the parties where Plaintiff supplied the Hospital Administrator for Defendant and acted as his employer by recruiting and retaining him.  In order for it to do so, it was given broad latitude regarding salary and the types of benefits.  However, in order to protect Defendant's interest in controlling

-13-

quality and costs, the administrator's qualifications and cost had to be acceptable to it. In this case, upon being notified for the first time of the cost of the severance/release payments being given to Osmus, Defendant's Board promptly considered the matter and found most of the cost to be unacceptable. It immediately communicated this to Plaintiff.[11] It did not breach the contract and does not owe Plaintiff more money as reimbursement for the severance/release payments. Defendant's motion for summary judgement will be granted and Plaintiff's will be denied.

**IT IS THEREFORE ORDERED** that Defendant's motion for summary judgment (Docket No. 14) is granted, that Plaintiff's motion for summary judgment is denied (Docket No. 16), and that this action is dismissed.

                                                   /s/ Russell A. Eliason
                                         **United States Magistrate Judge**

November 29, 2007

---

[11] Plaintiff notes, and correctly so, that nothing in Section 2.42 required it to disclose its severance policy to Defendant prior to seeking reimbursement for the severance/release payments to Osmus. However, it is also true that a party can neither accept nor reject an unknown cost. By not informing Defendant of the severance payment until it was due, Plaintiff necessarily delayed a determination of the acceptability of the payment's cost until that time and assumed the risk that Defendant would find it unacceptable.

-14-